IRVING, P.J.,
dissenting:
¶ 13. The circuit court, finding no genuine issue of material fact to be decided by a jury, granted summary judgment to At-tala County against the wrongful-death beneficiaries of Dewayne Russell, who was killed when a county fire truck ran over him as he lay on the pavement in the westbound lane of Highway 14, west of Kosciusko, Mississippi. Russell had survived a one-car accident and was waiting for rescue help to arrive.
¶ 14. In its motion for summary judgment, the County alleged that (1) it was immune from liability; (2) Russell was engaged in criminal activity at the time of the accident, thereby relieving Attala County of any liability for his death; and (3) it was exempt from liability because its fire department was responding to a call that was a discretionary function of county government. The circuit court found that the County was exempt from liability. It did not specify the basis for its finding. However, it appears that the circuit court found that Fisher, the driver of the fire truck that ran over Russell, did not act in reckless disregard of Russell’s safety when he drove the fire truck over Russell and killed him. The majority agrees. Because I think a genuine issue exists as to whether Fisher acted with reckless disregard of Russell’s safety, I dissent. I would reverse and remand this ease for further proceedings.
¶ 15. In support of its motion for summary judgment, the County presented the following documents: (1) the accident report of Russell’s accident; (2) the statement of Wilma Kitchens, who made the 911 call to report Russell’s accident; (3) *1089 the statement of Quincy Griffin, who heard Russell’s truck slide across some rocks and saw Russell walk across the highway with a cell phone; (4) the report of Fisher’s accident, resulting in Russell’s death; (5) the E-911 dispatcher report; (6) the deposition of Mark Fisher; (7) the autopsy report; and (8) the toxicology report.
¶ 16. In opposition to the motion for summary judgment, the wrongful-death beneficiaries presented without opposition, among other things, the investigative report of the accident as prepared by Master Sergeant Jimmie D. Thomas of the Mississippi Bureau of Investigation. In my judgment, that report creates a genuine issue as to whether Fisher acted with reckless disregard of Russell’s safety.
¶ 17. First and foremost, the most glaring evidence of Fisher’s reckless disregard of Russell’s safety was his failure to see Russell lying on the pavement. There is no extended hood on a fire truck, so the driver of a fire truck has absolutely nothing blocking his view of the road. In this case, another firefighter, who was a passenger in the truck, saw Russell and brought to Fisher’s attention that Russell was lying in the road. The fire truck’s high beam lights were on, yet Fisher did not see Russell until it was brought to his attention that Russell was lying on the pavement. Nothing obstructed Fisher’s view of the road. I quote extensively from that report:
On 12 April 2009 at 0920 hours, Trooper Philip Coffee, D27, contacted me, Master Sergeant Jimmie D. Thomas, to assist him with a fatal one-car motor vehicle collision on MS 14[,] west of Kosciusko. Preliminary investigation indicated at approximately 0115 hours a white 1998 Ford Explorer, Mississippi registration ATI416, was eastbound when it ran off the right shoulder of the highway, came back onto the pavement skidding sideways and crossing the highway, collided with a driveway embankment and two trees, and came to rest facing in a southeasterly direction. The driver, Benjamin Dewayne Russell, 18, of 8129 Attala Road 2247, Kosciusko, MS was found dead lying in the westbound land of MS 14 approximately forty feet south of the vehicle. (See accident [rjeconstructionist’s diagram.) Initially, Coffee thought Russell was ejected; however, he felt the profile of the vehicle’s direction of travel should have caused his body to be located north and east of its location. On-scene pictures taken by Trooper Coffee, show extreme trauma to Russell’s face and head. His head appeared to be crushed with an open wound on the left side of it with brain tissue extruding from it. I observed dual wheel tire marks on the highway going from the westbound land into the eastbound lane and back into the westbound lane. The right wheels[’] tire marks were aligned with the location of the body. There were several spots of brain tissue in close proximity of the body located in the westbound lane west of the body. Some of these were marked for accident reconstruction purposes. I contacted Lieutenant Jim Miller at this time and advised him that I believed this to be a hit-and-run rather than an ejection due to the location of Russell’s body, sustained injuries, body tissue and its location on the highway, and skid marks and their location in proximity of the body. Troop 13 Accident Reconstruction Officer, Staff Sergeant Brad Vincent, was also notified to reconstruct the accident. Vincent performed the reconstruction on 16 April 2009. (See Uniform Crash Report.)
I spoke with Wilma Kitchens and her son, Quincy Griffin, who live in a manufactured home approximately seventy- *1090 five yards northwest of the accident site, regarding the accident. Mrs. Kitchens said that at approximately 0120 hours, she heard the sound of “squalling tires and a thump.” Her son, Quincy, alerted her to the fact that a collision had occurred near his great-grandfather’s house. Mrs. Kitchens said that she looked out the window and saw a pickup truck off the road. She also stated that she could hear the dinging of the doorbell in the wrecked vehicle. Quincy said he heard an automobile slide across rocks at approximately 0115 hours. He stated that he looked out the window and saw the wrecked vehicle’s tail lights go from bright to dim multiple times. I asked if it looked similar to someone applying the brakes. He said that it did. He stated that he and his mother watched for about ten minutes before calling 911. During that time, he stated that he saw someone walking across the highway using a cell phone. I inquired as to how he knew he or she was using a cell phone. He stated that he could see the light from the cell phone while it was in his hand and not up to his ear. He stated that earlier he had seen the interior lights come on in the vehicle. Mrs. Kitchens added that she could hear the dinging of the vehicle’s doorbell after Quincy had seen the individual walking in the highway. (See Kitchens & Griffin statements.)
I went to the Attala County Fire Department Station 1 and talked to Chief Roy Williams about the incident. He discussed the incident and provided me with a written statement. Chief Williams stated he was the second unit on scene behind the rescue truck. He stated that he viewed the victim and met Fireman Mark Fisher between the body and the rescue truck. He said Fisher asked him if he was dead. Chief Williams replied that he was dead and that he (Fisher) should get the vehicle information. Williams also stated that he asked the firefighters if they ran over the victim. Both told Williams that they did not think they hit the victim. (See Williams’[s] statement.)
After interviewing Chief Williams, I spoke with probationary firefighter Patrick Mitchell. Mitchell stated that he saw the body in the roadway then the wrecked vehicle on the right. He stated that Nicholas shouted, “He’s in the road!’’ Mitchell stated the victim appeared to be lying face down in the highway. He stated that Nicholas called communications and said they were on scene. He said they had stopped in the westbound lane beyond the body and stayed there. Mitchell said that he did not get out of the vehicle at any time during the response. (See Mitchell’s Statement.) I inquired of the Chief as to why Mitchell did not get out of the vehicle. He stated that he did not want Mitchell viewing such a scene because it might scare him off. In an additional interview on 15 April 2009, Mitchell added that he was in the back passenger-side seat of the unit [,] and he thought they were going 60-65 miles per hour when he saw the body lying face down in the highway. Also, he stated that Fisher swerved so violently that he thought they were going to turn over[,\ and he had to hold on. Mitchell said whW they finished with the scene Fisher turned the rescue unit around and washed the highway off. They fueled up at the Kangaroo Store and went back to the fire station.
Afterwards, I interviewed the rescue unit driver, Mark Fisher. Fisher said they received the call after 0100 hours on 13 April 2009. They headed up MS 43 and onto MS 14 westbound. Fisher stated they saw the body, moved left *1091 into the eastbound lane, and then back into the westbound land stopping near where the pickup truck ran off the highway. Fisher stated he exited the Squad and walked back (eastbound) toward the body [,] meeting Chief Williams about halfway between the body and the Squad. He said he asked the Chief if the victim was dead. Chief Williams replied, “Yes.” Fisher stated that he then went back to his unit and backed up approximately ninety feet, turned on the scene lights, and gathered information from the wrecked vehicle. Fisher stated they remained at the position until finished with the scene. (He said the ambulance, upon arrival, staged between his rescue unit and the body.) I asked him if he ran over Russell. He stated that he swerved hard to the left and did not think that he ran over Russell. Further, he said that he felt no bump or anything indicating that he may have hit Russell [;] he (the rescue unit) was so close to [Russell’s] body that he could have hit Russell with his rear wheels.
⅝ ijs ⅜
On 15 April 2009, I requested a copy of the E-911 radio log and audio communication from 13 April 2009, 0000-0400 hours. Liz Perteet, E-911 Coordinator, made the copies for me. While listening to the radio transmissions, I noticed intensity in the transmission from Squad One Firefighter Nicholas Cox and Chief Roy Williams. (See E-911 Transcript, page 4, lines 82 thru 84.) It is evident from the radio communication that Squad 1 and FD1 arrived on the scene at approximately the same time with Attala County 9 close behind them. I questioned Nicholas Cox and Chief Williams regarding the transmission. Cox stated he knew Chief Williams was behind them[,] and he was trying to warn him to slow down. Williams stated he was trying to let everyone know to slowdown. Also noted was the fact that Cox called Chief Williams to “come to the Squad.”
I interviewed and obtained a written statement from Firefighter Nicholas A. Cox on 15 April 2009. Cox stated he saw brake lights HI mile ahead of them on MS II and thought that might be the location of the scene. Upon arrival in the area of the brake lights, he stated that he saw the patient lying in the road and told Fisher to get over. Additionally, he told Chief Williams via radio to “break it down” because he knew the Chief was behind them. He stated they went past the victim to where the victim’s tire tracks left the roadway and stopped. Cox stated he asked Fisher if he hit him. He said Fisher replied that he didn’t think so and afterwards said no he didn’t hit him. After exiting the rescue unit, he stated the Chief walked toward them and said the victim is deceased. Cox stated that they told Chief Williams that they came up on him so fast that they thought they hit him. He said Chief Williams asked them if they hit him. Cox stated that both he and Fisher said “no.” Cox said the Chief replied, “If both of you say no, then we will leave it at that.” Cox stated they were traveling about 55-60 miles per hour when they saw the victim. He said they saw the victim first, then the (victim’s) truck. Cox stated that they saw the victim 20-30 feet in front of them when Fisher swerved. After talking to Chief Williams, Cox told Fisher to back the rescue unit up, locating it approximately fifteen feet from the victim. Cox stated Chief Williams’[s] pickup was approximately ten feet east of the victim. Both, Cox and Fisher assisted EMS in looking for other victims. In addition, they held the sheet, to obscure public view, for D-27, Trooper Philip *1092 Coffee, and Coroner Sam Bell. Cox said he witnessed Coffee remove a substance of some kind from the victim’s right front pant pocket that appeared to be drugs.
On 15 April 2009, at 1689 hours, I spoke with the victim’s father, Richard Dewayne Russell, and his girlfriend, Lynn Christopher, regarding alleged phone calls the victim made to them. (See phone records.) According to a verbal and written statement, Christopher said that Ben called at 0111 hours and stated that he was on his way home from Holmes Community College. About ten to fifteen minutes later, Danny, Ben’s twelve-year-old brother, carried his phone to Christopher and said Ben was upset and wanted to talk to her. She said Ben was crying and stated that he had been in a wreck and could not feel his legs. Christopher stated that Ben told her he would be by the road. She said they left home, got gas at the Exxon station and proceeded to his location. She stated that Ben called again at 0141 and said that he could not feel his legs. She stated that she could hear the doorbell dinging in the truck during the time she was talking to him (on the phone). Christopher said, since she was driving, she gave the phone to Danny so he could continue to talk to Ben. Christopher said that Danny called Ben on his phone at 014-6 hours and Ben stated to Danny, “Get Lynn on the phone, I can’t breathe — help me!” (See Christopher statement.) Richard Russell, Ben’s father voluntarily surrendered his phone records and Danny’s phone for comparison. I obtained Benjamin Russell’s broken cell phone from Attala County Coroner Sam Bell. This phone was recovered from the roadway near his body. The phone was broken in three pieces. I also obtained copies, both audio and written, of Kosciusko E-911 Communications Dispatch radio transmissions for comparison to the phone records.
¶ 18. It is noteworthy that Cox called Chief Williams, who was traveling to the scene of the accident in close proximity behind the fire truck, and told him to come to Squad One (the fee truck). One is justified in wondering why it was so urgent that Cox and Fisher speak with Chief Williams as soon as he arrived on the scene. It also is noteworthy that according to Master Sergeant Thomas’s investigative report, Cox told Thomas that they [(Fisher, Cox, and Mitchell) ] came up on [.Russell ] so fast that they thought they hit him, but Cox told Chief Williams that they did not run over Russell. Upon hearing this, Chief Williams said, “If both of you say no, then we will leave it at that.” Later, Cox and Fisher would state that they did not think they had struck Russell.
¶ 19. In my view, the somewhat contradictory statements by Cox and Fisher regarding whether they had struck Russell; the fact that Fisher had an unobstructed, clear view of the highway ahead of him as they traveled to the scene of the accident; and the fact that they apparently had an urgent need to talk to Chief Williams immediately upon his arrival at the scene suggest that the question — whether Fisher had acted with reckless disregard of Russell’s safety — should be decided by a jury, not the circuit judge. I want to be clear; I am not insinuating that either Williams, Cox, or Fisher has acted improperly. But summary judgment should never be granted unless there is no genuine issue as to a material fact.
¶ 20. The circuit court correctly observed that Fisher’s speed in traveling to the scene is irrelevant because he was driving an emergency vehicle and was authorized to drive over the speed limit. See Miss.Code Ann. § 63-8-517 (Rev.2004). *1093 However, in doing so, he was still required to keep a proper lookout. The circuit court also appeared to assign great weight to Fisher’s deposition testimony that, based on his experience in responding to accidents, he did not expect to find a person who may have been ejected from a wrecked vehicle in the roadway. It is sufficient to say that the record contains no evidence that Wilma Kitchens mentioned anything about a person being ejected from a vehicle when she made the E-911 call, so what Fisher may not have expected to find in the roadway is irrelevant. However, it is relevant as to what he failed to see. It is inexplicable to me how one could be driving a fire truck down a highway with an unobstructed view of the road ahead and with lights on high beam but not see a person lying in the highway.
¶ 21. I am mindful of the high bar that the wrongful-death beneficiaries have to surmount at trial. It would not be enough to show that Fisher might have been guilty of simple negligence. However, at the summary judgment stage, the County was required to show that it was entitled to summary judgment because no genuine issue existed as to whether Fisher acted with reckless disregard of Russell’s safety. In my opinion, it failed to do so. For the reasons discussed, I dissent.
LEE, C.J., CARLTON AND RUSSELL, JJ„ JOIN THIS OPINION.